UNITED STATES DISTRICT COURT
FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA

ANNIE J. ENNIS,                      :
                                     :
        Plaintiff                    :    No. 4:11-CV-01788
                                     :
     vs.                             :    (Complaint Filed 9/27/11)
                                     :
MICHAEL ASTRUE,                      :
COMMISSIONER OF SOCIAL               :    (Judge Munley)
SECURITY,                            :
                                     :
        Defendant                    :

**MEMORANDUM**

**Background**

        The above-captioned action is one seeking review of a

decision of the Commissioner of Social Security ("Commissioner")

denying Plaintiff Annie J. Ennis's claim for social security

disability insurance benefits and supplemental security income

benefits.

        On September 2, 2009, Ennis filed protectively[1] an

application for disability insurance benefits and on September

22, 2009, an application for supplemental security income

benefits. Tr. 20, 109-118, 138, 162 and 167.[2]  On November 17,

_____

1. Protective filing is a term for the first time an individual
contacts the Social Security Administration to file a claim for
benefits.  A protective filing date allows an individual to have
an earlier application date than the date the application is
actually signed.

2. References to "Tr.__" are to pages of the administrative
record filed by the Defendant as part of his Answer on November
23, 2011.

2009, the Bureau of Disability Determination[3] denied Ennis's applications. Tr. 87-95.  On January 12, 2010, Ennis requested a hearing before an administrative law judge. Tr. 100. After about 10 months had passed, a hearing before an administrative law judge was held on November 3, 2010. Tr. 59-83.  On December 17, 2010, the administrative law judge issued a decision denying Ennis's applications. Tr. 20-28.  On February 11, 2011, Ennis requested that the Appeals Council review the administrative law judge's decision and on July 29, 2011, the Appeals Council concluded that there was no basis upon which to grant Ennis's request for review. Tr. 7-11, 13-16 and 215-220.  Thus, the administrative law judge's decision stood as the final decision of the Commissioner.

Ennis then filed a complaint in this court on September 27, 2011.  Supporting and opposing briefs were submitted and the appeal[4] became ripe for disposition on February 17, 2012, when Ennis elected not to file a reply brief.

Disability insurance benefits are paid to an individual if that individual is disabled and "insured," that is, the individual has worked long enough and paid social security taxes.

---

3. The Bureau of Disability Determination is an agency of the state which initially evaluates applications for disability insurance benefits and supplemental security income benefits on behalf of the Social Security Administration.  Tr. 87 and 92.

4. Under the Local Rules of Court "[a] civil action brought to review a decision of the Social Security Administration denying a claim for social security disability benefits" is "adjudicated as an appeal."  M.D.Pa. Local Rule 83.40.1.

The last date that a claimant meets the requirements of being insured is commonly referred to as the "date last insured." It is undisputed that Ennis met the insured status requirements of the Social Security Act through September 30,2010. Tr. 20, 22, 141, 162, 167 and 202. In order to establish entitlement to disability insurance benefits Ennis was required to establish that she suffered from a disability on or before that date. 42 U.S.C. § 423(a)(1)(A), (c)(1)(B); 20 C.F.R. §404.131(a)(2008); see Matullo v. Bowen, 926 F.2d 240, 244 (3d Cir. 1990).

Supplemental security income is a federal income supplement program funded by general tax revenues (not social security taxes). It is designed to help aged, blind or other disabled individuals who have little or no income. Insured status is irrelevant in determining a claimant's eligibility for supplemental security income benefits.

Ennis, who was born in the United States on July 2, 1956,[5] withdrew from school in 1971 while attending the 10th grade. Tr. 65, 84-85, 109, 116, 188-189. Ennis can read, write,

---

5. Ennis was 54 years of age on the date of the administrative hearing and on the date the ALJ issued her decision. Under the Social Security regulations a person 50 to 54 years of age is considered a "person closely approaching advanced age." 20 C.F.R. §§ 404.1563(c) and 416.963(c). The Social Security Administration considers a claimant 50 to 54 who has a severe impairment and limited work experience as someone who may not be able to adjust to other work. Id. If Ennis would have been limited to sedentary work and also found to have no transferable job skills and unable to perform her prior relevant work by the administrative law judge, she would have been entitled to disability insurance benefits. See Medical-Vocational Rules 201.00(g) and 201.09, 20 C.F.R. Part 404, Subpart P, Appendix 2.

speak, and understand the English language and perform basic mathematical functions. Tr. 66 and 181.  During her elementary and secondary schooling, Ennis did attend certain unspecified special education classes. Tr. 66 and 189.  After withdrawing from school, Ennis did not obtain a General Equivalency Diploma or complete any type of job training. Id.

Ennis's work history covers the years 1972 through 1976, 1978, 1979, 1982, 1986, 1989, 1990, and 1994 to  July 17, 2009. Tr. 67, 131, 164 and 182. Ennis's total earnings during those years were $53,774.74. Tr. 164.  Her annual earnings ranged from a low of $18.85 in 1979 to a high of $7560.48 in 2003. Id. Ennis had employment as a fast-food worker, a cafeteria attendant and as a personal care aide. Tr. 79, 211 and 281.

A vocational expert who testified at the administrative hearing described the positions of fast-food worker and cafeteria attendant as unskilled, light work.[6] Tr. 79.

_____

6. The terms sedentary, light, medium, heavy and very heavy work are defined in the regulations of the Social Security Administration as follows:

> (a) *Sedentary work.* Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

> (b) *Light work*.  Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even

The vocational expert did not categorize the position of personal care aide but from Ennis's description of the position it was at least unskilled, light work.[7]

Ennis claims that she became disabled on January 24,

though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

(c) *Medium work*. Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If someone can do medium work, we determine that he or she can do sedentary and light work.

(d) *Heavy work*. Heavy work involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds. If someone can do heavy work, we determine that he or she can also do medium, light, and sedentary work.

(e) *Very heavy work*. Very heavy work involves lifting objects weighing more than 100 pounds at a time with frequent lifting or carrying of objects weighing 50 pounds or more. If someone can do very heavy work, we determine that he or she can also do heavy, medium, light and sedentary work.

20 C.F.R. § 404.1567.

7. As will be explained in more detail below, the ALJ found that Ennis had the residual functional capacity to engage in light work, including the lifting requirement of 20 pounds and 10 pounds frequently. "Frequently" is defined as up to two-thirds of an 8-hour workday or approximately 5.33 hours.

2009, because of degenerative disc disease of the lumbar spine.[8]

_____

8.    Discogenic disease or degenerative disc disease is disease or degeneration of the intervertebral discs.  The intervertebral discs, the soft cushions between the 24 bony vertebral bodies, have a tough outer layer and an inner core composed of a gelatin-like substance, the nucleus pulposus. The outer layer of an intervertebral disc is called the annulus fibrosus. A bulge (protrusion) is where the annulus of the disc extends beyond the perimeter of the vertebral bodies. A herniation is where the nucleus pulposus goes beyond its normal boundary into the annulus and presses the annulus outward or ruptures the annulus. Such bulges(protrusions) and herniations if they contact nerve tissue can cause pain.  Degenerative disc disease (discogenic disease) has been described as follows:

> As we age, the water and protein content of the cartilage of the body changes. This change results in weaker, more fragile and thin cartilage. Because both the discs and the joints that stack the vertebrae (facet joints) are partly composed of cartilage, these areas are subject to wear and tear over time (degenerative changes). The gradual deterioration of the disc between the vertebrae is referred to as degenerative disc disease. . . Wear of the facet cartilage and the bony changes of the adjacent joint is referred to as degenerative facet joint disease or osteoarthritis of the spine. Trauma injury to the spine can also lead to degenerative disc disease.

> Degeneration of the disc is medically referred to as spondylosis. Spondylosis can be noted on x-ray tests or MRI scanning of the spine as a narrowing of the normal "disc space" between the adjacent vertebrae.

> Degeneration of the disc tissue makes the disc more susceptible to herniation. Degeneration of the disc can cause local pain in the affected area. Any level of the spine can be affected by disc degeneration. When disc degeneration affects the spine of the neck, it is referred to as cervical disc disease. When the mid-back is affected, the condition is referred to as thoracic disc disease. Disc degeneration that affects the lumbar spine can cause chronic low back pain (referred to as lumbago) or irritation of a spinal nerve to cause pain radiating down the leg (sciatica). Lumbago causes pain localized to the low back and is common in older people. Degenerative arthritis (osteoarthritis) of the facet joints is also a cause of localized lumbar pain that can be detected with plain x-ray testing is also

6

Doc. 9, Plaintiff's Brief, p. 2.  Ennis contends her degenerative

disc disease was "exacerbated by an injury while working" on that

date. Id.  One of the records describes this work related injury

as follows:

> The patient states that she is seeking physical therapy
> for a low back/sacral injury which she sustained at
> work on 1/24/09. She was employed at Independent Living
> Services as a Personal Care Aide.  She states that on
> 1/24/09, she went to sit down on at a client's home
> when the chair legs broke causing her to fall and land
> on her tailbone and low back.  She reports feeling
> immediate pain which worsened overnight.  The next
> day, she went to IndustraMed.  She then went to Dr.
> Mauthe. . . .
>
> Patient describes her pain as "constant, stabbing" at
> her tailbone, T12-L2 and T2 paraspinals. She states
> That this pain is present 100% of the day. . . .
>
> Annie has had the following diagnostic tests: MRI, bone
> scan, EMG and x ray. X-ray, bone scan and MRI reports
> revealed degenerative changes . . . There was no
> evidence of disc herniation, nerve root compressions[,]
> central spinal stenosis or foraminal stenosis.

Tr. 296.  Two days after the alleged injury, Ennis's physician

employed by IndustraMed advised her to return to work without

restrictions. Tr. 378.  However, subsequently her treating

physicians (including those involved in a Workers' Compensation

claim filed by Ennis) restricted her to less than the exertional

---

> a cause of localized lumbar pain.  The pain
> from degenerative disc disease of the spine is usually
> treated conservatively with intermittent heat, rest,
> rehabilitative exercises, and medications to relieve
> pain, muscle spasms, and inflammation.

William C. Shiel, Jr., M.D., Degenerative Disc Disease and
Sciatica, MedicineNet.com, http://www.medicinenet.
com/degenerativedisc/page2.htm (Last accessed December 27, 2012).
Degenerative disc disease is considered part of the normal aging
process. Id.

requirements (specifically the lifting requirement) of light work. On February 2, 2009, Leslie Dubowitz, M.D., also employed by IndustraMed, opined that Ennis could return to work provided that she not lift more than 15 pounds and avoid bending and squatting. Tr. 375. On February 11 and 16, 2009, Dr. Dubowitz continued to opine that Ennis could return to work at modified duty but increased her restrictions to preclude lifting more than 10 pounds and avoiding bending, squatting, pushing, pulling, and twisting. Tr. 368 and 370. On February 23, 2009, Bruno Schettini, M.D., of IndustraMed, opined that Ennis could return to work but that she could not lift more than 15 pounds, should avoid bending or squatting, and not lift or transfer patients. Tr. 365. On March 9, 2009, Dr. Schettini released Ennis back to work provided that she not lift or transfer patients. Tr. 362. After re-checks on March 9, March 31, April 14, and April 24, 2009, Dr. Schettini continued to opine that Ennis could not lift or transfer patients. Tr. 353, 356, 359 and 362. On June 5, 2009, Dr. Schettini indicated that Ennis should avoid prolonged standing and walking and not lift or transfer patients. Tr. 350. No treating or examining physician indicated that Ennis had the capacity to engage in the lifting/carrying requirements of light work on a full-time basis (8 hours per day, 5 days per week or similar such schedule).

On August 17, 2010, Raymond J. Kraynak, D.O., one of Ennis's treating physicians stated that Ennis had limited lumbar range of motion and a wide stiff gait. Tr. 404. He further stated

that Ennis was prescribed Vicodin, a narcotic, for pain. Id.  He
opined that Ennis suffered from degenerative disc disease and
neuropathy and that she was "totally and permanently disabled
from any and all employment.". Id.  At the administrative
hearing, the ALJ was informed by Ennis that she was being treated
by Dr. Kraynak.  Tr. 68. In fact, Ennis stated that she was
seeing Dr. Kraynak "nearly every month." Tr. 68.  However, the
ALJ did not take any steps to obtain records from Dr. Kraynak.

     The record does not contain a functional assessment
from a state agency physician.

     The administrative record in this case is 404 pages in
length and we have thoroughly reviewed that record.  In the
present appeal Ennis has raised two arguments.  The
administrative law judge failed to properly assess the
credibility of Ennis and failed to properly consider the opinion
of Dr. Kraynak.  Both of those arguments have merit. The
administrative law judge further failed to appropriately develop
the record.  Set forth below is a more detailed explanation for
remanding this case to the Commissioner.

## STANDARD OF REVIEW

     When considering a social security appeal, we have
plenary review of all legal issues decided by the Commissioner.
See Poulos v. Commissioner of Social Security, 474 F.3d 88, 91
(3d Cir. 2007); Schaudeck v. Commissioner of Social Sec. Admin.,
181 F.3d 429, 431 (3d Cir. 1999); Krysztoforski v. Chater, 55
F.3d 857, 858 (3d Cir. 1995).  However, our review of the

Commissioner's findings of fact pursuant to 42 U.S.C. § 405(g) is to determine whether those findings are supported by "substantial evidence."  Id.; Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988); Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993). Factual findings which are supported by substantial evidence must be upheld. 42 U.S.C. §405(g); Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001)("Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently."); Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981)("Findings of fact by the Secretary must be accepted as conclusive by a reviewing court if supported by substantial evidence.");  Keefe v. Shalala, 71 F.3d 1060, 1062 (2d Cir. 1995); Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001);  Martin v. Sullivan, 894 F.2d 1520, 1529 & 1529 n.11 (11th Cir. 1990).

        Substantial evidence "does not mean a large or considerable amount of evidence, but 'rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 565 (1988)(quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)); Johnson v. Commissioner of Social Security, 529 F.3d 198, 200 (3d Cir. 2008);  Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999).  Substantial evidence has been described as more than a mere scintilla of evidence but less than a preponderance. Brown, 845 F.2d at 1213.  In an adequately developed factual record substantial evidence may be "something less than the

10

weight of the evidence, and the possibility of drawing two
inconsistent conclusions from the evidence does not prevent an
administrative agency's finding from being supported by
substantial evidence." <u>Consolo v. Federal Maritime Commission</u>,
383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to
all the other evidence in the record," <u>Cotter</u>, 642 F.2d at 706,
and "must take into account whatever in the record fairly
detracts from its weight." <u>Universal Camera Corp. v. N.L.R.B.</u>,
340 U.S. 474, 488 (1971). A single piece of evidence is not
substantial evidence if the Commissioner ignores countervailing
evidence or fails to resolve a conflict created by the evidence.
<u>Mason</u>, 994 F.2d at 1064. The Commissioner must indicate which
evidence was accepted, which evidence was rejected, and the
reasons for rejecting certain evidence. <u>Johnson</u>, 529 F.3d at 203;
<u>Cotter</u>, 642 F.2d at 706-707. Therefore, a court reviewing the
decision of the Commissioner must scrutinize the record as a
whole. <u>Smith v. Califano</u>, 637 F.2d 968, 970 (3d Cir. 1981);
<u>Dobrowolsky v. Califano</u>, 606 F.2d 403, 407 (3d Cir. 1979).

Another critical requirement is that the Commissioner
adequately develop the record. <u>Shaw v. Chater</u>, 221 F.3d 126, 131
(2d Cir. 2000)("The ALJ has an obligation to develop the record
in light of the non-adversarial nature of benefits proceedings,
regardless of whether the claimant is represented by counsel.");
<u>Rutherford v. Barnhart</u>, 399 F.3d 546, 557 (3d Cir. 2005);
<u>Fraction v. Bowen</u>, 787 F.2d 451, 454 (8th Cir. 1986); <u>Reed v.</u>

<u>Massanari</u>, 270 F.3d 838, 841 (9th Cir. 2001); <u>Smith v. Apfel</u>, 231
F.3d 433. 437 (7th Cir. 2000); <u>see</u> <u>also</u> <u>Sims v. Apfel</u>, 530 U.S.
103, 120 S.Ct. 2080, 2085 (2000)("It is the ALJ's duty to
investigate the facts and develop the arguments both for and
against granting benefits[.]").  If the record is not adequately
developed, remand for further proceedings is appropriate.  <u>Id.</u>

**SEQUENTIAL EVALUATION PROCESS**

To receive disability benefits, the plaintiff must
demonstrate an "inability to engage in any substantial gainful
activity by reason of any medically determinable physical or
mental impairment which can be expected to result in death or
which has lasted or can be expected to last for a continuous
period of not less than 12 months."  42 U.S.C. § 432(d)(1)(A).
Furthermore,

> [a]n individual shall be determined to be under a
> disability only if his physical or mental impairment
> or impairments are of such severity that he is not
> only unable to do his previous work but cannot,
> considering his age, education, and work experience,
> engage in any other kind of substantial gainful work
> which exists in the national economy, regardless of
> whether such work exists in the immediate area in which
> he lives, or whether a specific job vacancy exists for
> him, or whether he would be hired if he applied for
> work.  For purposes of the preceding sentence (with
> respect to any individual), "work which exists in the
> national economy" means work which exists in
> significant numbers either in the region where such
> individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A).

The Commissioner utilizes a five-step process in
evaluating disability insurance and supplemental security income
claims.  <u>See</u> 20 C.F.R. §404.1520 and 20 C.F.R. § 416.920; <u>Poulos</u>,

474 F.3d at 91-92.  This process requires the Commissioner to consider, in sequence, whether a claimant (1) is engaging in substantial gainful activity,[9] (2) has an impairment that is severe or a combination of impairments that is severe,[10] (3) has an impairment or combination of impairments that meets or equals the requirements of a listed impairment,[11] (4) has the residual

---

9. If the claimant is engaging in substantial gainful activity, the claimant is not disabled and the sequential evaluation proceeds no further. Substantial gainful activity is work that "involves doing significant and productive physical or mental duties" and "is done (or intended) for pay or profit."  20 C.F.R. § 404.1510 and 20 C.F.R. § 416.910.

10. The determination of whether a claimant has any severe impairments, at step two of the sequential evaluation process, is a threshold test. 20 C.F.R. §§ 404.1520(c) and 416.920(c). If a claimant has no impairment or combination of impairments which significantly limits the claimant's physical or mental abilities to perform basic work activities, the claimant is "not disabled" and the evaluation process ends at step two.  Id.  If a claimant has any severe impairments, the evaluation process continues.  20 C.F.R. §§ 404.1520(d)-(g) and 416.920(d)-(g). Furthermore, all medically determinable impairments, severe and non-severe, are considered in the subsequent steps of the sequential evaluation process.  20 C.F.R. §§ 404.1523, 404.1545(a)(2), 416.923 and 416.945(a)(2). An impairment significantly limits a claimant's physical or mental abilities when its effect on the claimant to perform basic work activities is more than slight or minimal. Basic work activities include the ability to walk, stand, sit, lift, carry, push, pull, reach, climb, crawl, and handle. 20 C.F.R. § 404.1545(b).  An individual's basic mental or non-exertional abilities include the ability to understand, carry out and remember simple instructions, and respond appropriately to supervision, coworkers and work pressures. 20 C.F.R. § 1545(c).

11. If the claimant has an impairment or combination of impairments that meets or equals a listed impairment, the claimant is disabled. If the claimant does not have an impairment or combination of impairments that meets or equals a listed impairment, the sequential evaluation process proceeds to the

13

functional capacity to return to his or her past work and (5) if not, whether he or she can perform other work in the national economy. Id. As part of step four the administrative law judge must determine the claimant's residual functional capacity. Id.[12]

Residual functional capacity is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. See Social Security Ruling 96-8p, 61 Fed. Reg. 34475 (July 2, 1996). A regular and continuing basis contemplates full-time employment and is defined as eight hours a day, five days per week or other similar schedule. The residual functional capacity assessment must include a discussion of the individual's abilities. Id; 20 C.F.R. §§ 404.1545 and 416.945; Hartranft, 181 F.3d at 359 n.1 ("'Residual functional capacity' is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).").

**DISCUSSION**

The administrative law judge at step one of the sequential evaluation process found that Ennis had not engaged in substantial gainful work activity since January 24, 2009, the alleged disability onset date. Tr. 22. The ALJ specifically stated as follows: "The claimant worked after the alleged disability onset date but this work activity did not rise to the

next step.

12. If the claimant has the residual functional capacity to do his or her past relevant work, the claimant is not disabled.

level of substantial gainful activity. The claimant attempted to
return to her past work as a home care aide, but she was unable
to perform the work and the earnings did not rise to the
substantial gainful level." Id.

At step two of the sequential evaluation process, the
administrative law judge found that Ennis had the following
severe impairments: "degenerative disc disease of the lumbar
spine." The administrative law judge did not address the issue
of whether Ennis suffered from neuropathy[13] as found by Dr.
Kraynak.

At step three of the sequential evaluation process the
administrative law judge found that Ennis's impairments did not
individually or in combination meet or equal a listed impairment.
Tr. 23.

At step four of the sequential evaluation process the
administrative law judge found that Ennis had no past relevant

13. "Neuropathy is a collection of disorders that occurs when
nerves of the peripheral nervous system (the part of the nervous
system outside of the brain and spinal cord) are damaged. The
condition is generally referred to as peripheral neuropathy, and
it is most commonly due to damage to nerve axons [nerve fibers].
Neuropathy usually causes pain and numbness in the hands and
feet. It can result from traumatic injuries, infections,
metabolic disorders, and exposure to toxins. . . Neuropathy can
affect nerves that control muscle movement (motor nerves) and
those that detect sensations such as coldness or pain (sensory
nerves). . . . Pain from peripheral neuropathy is often described
as a tingling or burning sensation." Medical News Today, What is
Neuropathy? Neuropathy Causes and Treatments, http://www.medical
newstoday.com/articles/147963.php (Last accessed December 26,
2012).

15

work[14] but that she had the residual functional capacity to engage in a limited range of light work with a sit/stand option. Id. Specifically, the ALJ stated as follows:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except she must be able to alternate positions between sitting and standing, but she would not be off task when transferring positions. The claimant cannot push and/or pull with her lower extremities. She can only occasionally balance, stoop, kneel, crouch, crawl, and climb, but she can never climb on ladders, ropes, and scaffolds. The claimant should avoid moderate exposure to cold, heat, vibration, and hazards. She is limited to simple routine tasks.

Id. In so finding, the administrative law judge rejected the opinion of Dr. Kraynak but pointed to no contrary medical opinion which indicated that Ennis could engage in the lifting and carrying requirements of light work on a full-time basis.

At step five, the administrative law judge based on a residual functional capacity of a limited range of light work as described above and the testimony of a vocational expert found that Ennis had the ability to perform work as a cashier, counter clerk and ticket taker[15] and that there were a significant number of such jobs in Northeastern Pennsylvania. Tr. 27.

---

14. The ALJ does not give any explanation for this finding. However, we assume it was because Ennis's earning did not rise the level of substantial gainful activity.

15. All of these position were described as light work positions as defined in the regulations of the Social Security Administration.

Initially we will note again that the administrative law judge rejected the opinion of Dr. Kraynak.  The preference for the treating physician's opinion has been recognized by the Court of Appeals for the Third Circuit and by all of the federal circuits. See, e.g., Morales v. Apfel, 225 F.3d 310, 316-18 (3d Cir. 2000).  When the treating physician's opinion conflicts with a non-treating, non-examining physician's opinion, the administrative law judge may choose whom to credit in his or her analysis, but "cannot reject evidence for no reason or for the wrong reason."  Id.  In choosing to reject the evaluation of a treating physician, an administrative law judge may not make speculative inferences from medical reports and may reject treating physician's opinions outright only on the basis of contradictory medical evidence. Id.  An administrative law judge may not reject a written medical opinion of a treating physician based on his or her own credibility judgments, speculation or lay opinion. Id.  An administrative law judge may not disregard the medical opinion of a treating physician based solely on his or her own "amorphous impressions, gleaned from the record and from his evaluation of the [claimant]'s credibility." Id.  As one court has stated, "Judges, including administrative law judges of the Social Security Administration, must be careful not to succumb to the temptation to play doctor" because "lay intuitions about medical phenomena are often wrong."  Schmidt v. Sullivan,

914 F.2d 117, 118 (7th Cir 1990).

In rejecting Dr. Kraynak's opinion the administrative law judge did not point to any contrary medical opinion but engaged in her own lay analysis of the medical records. The administrative law judge failed to give an adequate reason for rejecting the opinion of Dr. Kraynak. In setting the residual functional capacity at a limited range of light work, the administrative law judge purportedly relies on the medical records from Ennis's other treating physicians. However, none of those medical providers indicated that Ennis could perform the lifting/carrying requirements of light work on a full-time basis.

We recognize that the residual functional capacity assessment must be based on a consideration of all the evidence in the record, including the testimony of the claimant regarding her activities of daily living, medical records, lay evidence and evidence of pain. See Burnett v. Commissioner of Social Sec. Admin., 220 F.3d 112, 121-122 (3d Cir 2000). However, rarely can a decision be made regarding a claimant's residual functional capacity without an assessment from a physician regarding the functional abilities of the claimant. See Doak v. Heckler, 790 F.2d 26, 29 (3d Cir.1986)("No physician suggested that the activity Doak could perform was consistent with the definition of light work set forth in the regulations, and therefore the ALJ's conclusion that he could is not supported by substantial

evidence."); 20 C.F.R. § 404.1545(a).

>As two commentators have explained:
>
>>Sometimes administrative law judges assert that they -
>>and not physicians - have the right to make residual
>>functional capacity determinations. In fact, it can
>>reasonably be asserted that the ALJ has the right to
>>determine whether a claimant can engage in sedentary,
>>light, medium, or heavy work.  The ALJ should not
>>assume that physicians know the Social Security
>>Administration's definitions of those terms. <u>However,
>>the underlying determination is a medical
>>determination, i.e., that the claimant can lift five,
>>20, 50, or 100 pounds, and can stand for 30 minutes,
>>two hours, six hours, or eight hours. That
>>determination must be made by a doctor. Once the doctor
>>has determined how long the claimant can sit, stand or
>>walk, and how much weight the claimant can lift and
>>carry, then the ALJ, with the aid of a vocational
>>expert if necessary, can translate that medical
>>determination into a residual functional capacity
>>determination.</u>  Of course, in such a situation a
>>residual functional capacity determination is merely a
>>mechanical determination, because the regulations
>>clearly and explicitly define the various types of work
>>that can be performed by claimants, based upon their
>>physical capacities.

Carolyn A. Kubitschek & Jon C. Dubin, Social Security Disability
Law and Procedure in Federal Courts, 287-88 (2011)(emphasis
added); <u>see also</u> <u>Woodford v. Apfel</u>, 93 F.Supp.2d 521, 529
(S.D.N.Y. 2000)("An ALJ commits legal error when he makes a
residual functional capacity determination based on medical
reports that do not specifically explain the scope of claimant's
work-related capabilities."); <u>Zorilla v. Chater</u>, 915 F.Supp. 662,
667 (S.D.N.Y. 1996)("The lay evaluation of an ALJ is not
sufficient evidence of the claimant's work capacity; an
explanation of the claimant's functional capacity from a doctor
is required.").  The administrative law judge cannot speculate as

to a claimant's residual functional capacity but must have
medical evidence, and generally a medical opinion regarding the
functional capabilities of the claimant, supporting his
determination. Id.; see also Yanchick v. Astrue, Civil No. 10-
1654, slip op. at 17-19 (M.D.Pa. April 27, 2011)(Muir, J.)(Doc.
11); Coyne v. Astrue, Civil No. 10-1203, slip op. at 8-9 (M.D.Pa.
June 7, 2011)(Muir,J.)(Doc. 21); Crayton v. Astrue, Civil No. 10-
1265, slip op. at 38-39 (M.D.Pa. September 27, 2011)(Caputo,
J.)(Doc. 17); Dutton v. Astrue, Civil No. 10-2594, slip op. at
37-39(M.D.Pa. January 31, 2012)(Munley, J.)(Doc. 14); Gunder v.
Astrue, Civil No. 11-300, slip op. at 44-46(M.D.Pa. February 15,
2012)(Conaboy, J.)(Doc. 10).[16]

The administrative law judge in her decision when
judging the credibility of Ennis's claims of disabling pain
stated as follows;

_____

16. In Gunder Judge Conaboy reconciled the case of Chandler v.
Commissioner of Soc. Sec., F.3d.__, 2011 WL 6062067 (3d Cir.
Dec. 7. 2011) with Doak v. Heckler, 790 F.2d 26, 29 (3d
Cir.1986). Judge Conaboy stated as follows:

> Any argument from the Commissioner that his
> administrative law judges can set the residual function
> capacity in the absence of medical opinion or evidence
> must be rejected in light of Doak.  Furthermore, any
> statement in Chandler which conflicts (or arguably
> conflicts) with Doak is dicta and must be disregarded.
> Government of Virgin Islands v. Mills, 634 F.3d 746,
> 750 (3d Cir. 2011)(a three member panel of the Court of
> Appeals cannot set aside or overrule a precedential
> opinion of a prior three member panel).

Slip op. at 45-46.

In this case, the claimant's case in establishing
disability concerning her physical impairments is also
directly dependent on the element of pain which is
of an intractable nature.  Pain is subjective
and difficult to evaluate, both quantitatively and
qualitatively. Nevertheless, most organic diseases
produce manifestations other than pain and it is
possible to evaluate the underlying processes and
degree of resultant impairment by considering all of
the symptoms.  Generally, when an individual has
suffered pain over an extended period, there will be
observable signs such as a significant loss of weight,
**an altered gait** or **limitation of motion,** local morbid
changes, or poor coloring of station.  In the present
case, the claimant has complained of pain over an
extended period of time.  **None of the above signs of
chronic pain are evident.** While not conclusory by
itself, this factor contributes to the determination
that the claimant is not disabled as a result of pain.

Tr. 26 (emphasis added).  Our review of the record reveals that

on several occasions Ennis had medical or physical therapy

appointments where she exhibited an altered gait and limitation

of motion.[17] Tr. 282, 288 and 294. The record also reveals that

Ennis had atrophy of the foot muscles. Tr. 270 and 274.  The

administrative law judge's assertion that Ennis did not exhibit

an altered gait, limitation of motion or local morbid changes was

clearly erroneous.

Finally, the administrative law judge failed to

appropriately develop the record in this case. It is clear that

the record was insufficiently developed for the administrative

law judge to reject the opinion of Dr. Kraynak.  Because there

was no assessment regarding the exertional abilities of Ennis

_____

17. We recognize that the medical records reveal times when it was
found that Ennis had normal range of motion and a normal gait.

from a treating or evaluating physician and the bare medical records were insufficient for an administrative law to make such a determination, it was incumbent upon the administrative law judge to obtain such an assessment.[18]  It is clear that such an assessment could have been obtained by re-contacting Dr. Kraynak or referring Ennis to some other physician for an evaluation.

Our review of the administrative record reveals that the decision of the Commissioner is not supported by substantial evidence.

An appropriate order will be entered.


s/ James M. Munley
JAMES M. MUNLEY
United States District Judge

Dated: January 4, 2013

---

[18]. The Social Security regulations support the concept that when the evidence is insufficient to make a determination regarding disability, the administrative law judge must take steps to further develop the record. See 20 C.F.R. § 416.919a(b) ("Situations requiring a consultative examination."). In this case, the opinion of Dr. Kraynak supported a finding of disability and if the administrative law judge doubted that opinion she had the obligation to further develop the record. Id. She could not rely on her own lay analysis of the bare medical evidence to set the residual functional capacity.